IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DELKOR SYSTEMS, INC.,

Plaintiff,

v.

PRATT INDUSTRIES, INC., PRATT RETAIL SPECIALTIES, LLC, and PRATT (BELOIT CORRUGATING), LLC,

Defendants.

OPINION and ORDER

25-cv-306-jdp

---

The parties in this case are competitors in the packaging industry. Plaintiff Delkor Systems, Inc. alleges that defendants Pratt Industries, Inc., Pratt Retail Specialties, LLC, and Pratt (Beloit Corrugating), LLC, infringed two Delkor patents for a shipping box that converts into a retail-ready display case. Defendants, whom the court will refer to collectively as "Pratt," deny infringement.

Both sides have moved for summary judgment on infringement. (Pratt did not contest the patents' validity on summary judgment.) The parties agree about the structure and function of the accused product, so infringement turns on matters of claim construction and can be resolved without a trial.

The court concludes that the accused product does not have a "single tear line," which is a required element of every claim in dispute. The court will grant summary judgment to Pratt on noninfringement and close this case.

## BACKGROUND

Delkor is a Minnesota corporation that makes packaging equipment. Delkor owns the two patents-in-suit, U.S. Patent No. 9,555,919 and U.S. Patent No. 10,421,580, for a "Convertible Package Assembly and Display System." (The '580 patent is a continuation of the '919 patent.) The patents describe a piece of flat packaging material that can be folded in a specific way to form a shipping box. The top portion of the box can then be removed to form a retail-ready display case. Embodiments are shown below in the unassembled, or "case blank" configuration,[1] the shipping configuration, and the display configuration. '919 patent, Figures 12, 17, 23. The shipping configuration is converted to the display configuration by removing the top portion along the tear line (reference numbers 135 and 136).




FIG. 23




FIG. 12




FIG. 17

[1] A "case blank" is a flat sheet of packaging material from which a packaging case is assembled.

The patents' common specification describes several benefits of the claimed design compared with previous convertible packaging assemblies; specifically, the claimed design requires fewer materials, allows for easier machine assembly, and offers a more aesthetically pleasing display configuration compared with previous convertible packaging assemblies. '919 patent, 3:8–44.

Defendant Pratt is a Wisconsin corporation that also makes packaging equipment. Delkor asserts that Pratt infringed the '919 and '580 patents by manufacturing and selling a corrugated cardboard package for shipping and displaying frozen pizzas. The accused product is depicted below in the case blank configuration, shipping configuration, and display configuration.







Pratt denies that the accused product infringes Delkor's patents.

ANALYSIS

The parties' summary judgment motions concern only the issue of infringement. Delkor affirmatively moves for summary judgment that the accused product infringes its patents. Dkt. 74. Pratt moves for summary judgment of noninfringement. Dkt. 78.

**A. Basic legal principles**

Summary judgment is appropriate if the moving party shows that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, the court construes the facts, and draws all reasonable inferences from those facts, in favor of the nonmovant on the motion under consideration. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008).

The court applies a two-step analysis to evaluate infringement. First, the court determines the proper construction of disputed claim terms. Second, the court determines whether the claim, as properly construed, is infringed by the accused product. *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1359 (Fed. Cir. 2000). Delkor has the burden to prove infringement by a preponderance of the evidence. *High Point Design LLC v. Buyer's Direct, Inc.*, 621 F. App'x 632, 638, 640 (Fed. Cir. 2015).

A patent's claims define the scope of the invention, and thus the scope of the patentee's right to exclude others from practicing that invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Claim construction is the process by which the court determines the meaning and scope of the patent claims asserted to be infringed. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). Claim language receives "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313.

When construing a disputed term, the court must begin with the claim language itself. *Id.* But the court reads the claim language "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification" and its prosecution history. *Id.* at 1313. The patent and its prosecution history,

including the prior art that was cited during the examination of the patent, constitutes the intrinsic evidence of the claims' meaning. *Id.* at 1317. Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (internal quotation marks omitted).

The court may also consider extrinsic evidence, which refers to all other types of evidence, including inventor testimony, expert testimony, documentary evidence of how the patentee and alleged infringer have used the claim terms, dictionaries, treatises, and other similar sources. *Id.* at 1317–18. But extrinsic evidence is less useful in claim construction than the patent and its prosecution history. *Id.* at 1318. Intrinsic evidence trumps any extrinsic evidence that would contradict it. *Id.* at 1314–16.

Under an infringement analysis, the court must compare the properly construed claims to the accused device to determine as a matter of fact whether every claim element is present in the accused device. When, as here, the parties do not dispute the material aspects of the accused product but disagree over the meaning of the asserted claims, the question of infringement turns on claim construction and is amenable to resolution on summary judgment. *Gen. Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir. 1997); *Athletic Alts., Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996).

If a claim element is not literally present in the accused product, the product may nevertheless infringe under the doctrine of equivalents, if the accused product and the patented product perform substantially the same function in substantially the same way to obtain the same result. *Lite-Netics, LLC v. Nu Tsai Cap. LLC*, 60 F.4th 1335, 1346 (Fed. Cir. 2023). A patentee seeking to establish infringement under the doctrine of equivalents must "establish

'equivalency on a limitation-by-limitation basis' by 'particularized testimony and linking argument' as to the insubstantiality of the differences between the claimed invention and the accused device or process." *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1342 (Fed. Cir. 2016) (quoting *Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1566 (Fed. Cir. 1996)). Infringement under the doctrine of equivalents in a question of fact, but the court may resolve it at summary judgment "if the evidence is such that no reasonable jury could determine two elements to be equivalent." *U.S. Philips Corp. v. Iwasaki Elec. Co.*, 505 F.3d 1371 (Fed. Cir. 2007) (internal quotations omitted).

**B. Infringement of the "single tear line" limitation**

Delkor asserts that the accused product infringes claim 1 of the '919 patent and claims 5 and 7 of the '580 patent, both literally and under the doctrine of equivalents. The parties' infringement arguments focus on two issues: first, whether the accused product meets the "single tear line" limitation; and second, whether the accused product meets the "fifteen polygonal sections" limitation. The "single tear line" limitation is dispositive, so the court need not consider the "fifteen polygonal sections" limitation.

The independent claims of both patents require that the package assembly be formed from a "single piece of packaging material with a *single tear line*" and that the case be convertible from the shipping configuration to the display configuration by "separating the top portion from the bottom portion along the *single tear line*." '919 patent, 9:2–3; 9:19–23; '580 patent, 9:11–12; 9:31–33 (emphasis added). The parties dispute whether the "single tear line" limitation requires a continuous, physical line that extends through the entire case blank (Pratt's position), or whether the limitation encompasses tear lines that extend through other

features, such as a cut-out handhold (Delkor's position). This matters because the accused product contains a handhold in the middle of the tear line, as shown below:




Pratt says that the presence of the handhold means that the accused product contains not a single tear line, but two tear lines; thus, there is no infringement.

Both sides contend that their proposed construction is supported by the specification's description of the tear line and its function. The specification defines a "tear line" as a "mechanism for the removal of a portion of the package assembly." '580 patent, at 4:53–55. It states that tear lines "can be provided by any desired mechanism, such as for example: by providing a continuous line of perforations, a tear strip, a pre-cut incision that does not extend entirely through the material of the blank 30, etc." *Id.* at 8:12–15. As for the requirement that the tear line be a "single" line, the specification states: "[T]he tear lines 135, 136 form a single, continuous tear line. Thus the first and second tear lines 135, 136 can be considered to form sections of the single continuous tear line." *Id.* at 4:50–53.

The court concludes that Pratt's construction of "single tear line," which requires a continuous physical line through the case blank, is more consistent with the plain meaning of the disputed term and with how the disputed term is defined in the specification. To "tear" something means to pull or rip it apart. *Tear*, New Oxford American Dictionary 1732 (2d ed.

2005). So a "tear line" suggests a physical line where a piece of material can be pulled or ripped apart. A cut-out handhold isn't a "tear line" under that meaning, because the material inside the handhold has already been removed, so it can't be pulled or ripped apart. Further, the specification repeatedly describes the single tear line on the patented product as "continuous." '580 patent, at 4:50–53. That suggests a physical line that can be continuously torn, not two lines separated by a non-tearing feature like a handhold.

Delkor resists this conclusion with three arguments. First, Delkor points out that per the specification, the single tear line can be composed of multiple sections. That's true: in describing one embodiment, the specification states that "the tear lines 135, 136 form a single, continuous tear line. Thus the first and second tear lines 135, 136 can be considered to form sections of the single continuous tear line." *Id.* at 4:50–53 (referring to Figs. 14–17). But again, the specification describes the multiple sections of the tear line as "continuous." The tear line sections in Figure 14 cross a fold, but they form a continuous line on the case blank. This description excludes sections that are non-continuous because they are separated by a handhold.

Second, Delkor asserts that whether a tear line is a "single" tear line should be assessed based on the tear line's function; in other words, it's a single tear line if it can be torn from one end to the other in one fluid motion, even if it includes a handhold or other cut-outs. Delkor argues that this approach is supported by the specification, which defines a tear line based on its function as a "mechanism for the removal of a portion of the package assembly," '580 patent, at 4:53–55. But the functional definition doesn't contradict the plain meaning that a "tear line" has to be capable of being physically torn. On the contrary, the functional definition appears intended to distinguish lines that can be torn to facilitate removal of a portion of the

packaging assembly from lines that can be torn for other purposes. For instance, the specification acknowledges that in one embodiment, the packaging assembly has a perforated line that can be torn to create a handhold (reference number 170 in the image below). The specification states that that line is not a tear line because "no portion of the package assembly is removed when [it] is torn." '580 patent, 5:65–6:1.




FIG. 23

Third, Delkor notes that its patents incorporate by reference a previous patent by Leftwich et al., which disclosed a packaging assembly with a removable portion that included a cut-out handhold. U.S. Patent No. 5,657,872. An embodiment of the Leftwich packaging assembly is shown below:




Fig. 1

The Leftwich patent describes the removable portion as follows:

> Line of weakness 13 defines a severable portion 14 which comprises the portion of front side panel 7a between the line of weakness and the opening above front side panel 7a. The weakening of the region of the front panel 7a which comprises the "line of weakness" may be accomplished by full or partial perforation . . . or any other suitable method known in the art, of which perforation is presently preferred . . . The severable portion 14 of the front side panel 7a . . . preferably includes an aperture 8 adjacent to the midpoint of the line of weakness. In a preferred configuration, as depicted in Fig. 1, the aperture 8 is preferably semi-circular in shape with its lower edge adjacent the bottom panel 2 and its midpoint extending upwardly into the severable portion 14 such that its upper edge is arcuate in shape. The aperture provides a means of grasping the edge of the severable portion and initiating the tearing or severing operation along the line of weakness.

'872 patent, 3:34–62. Delkor argues that because Leftwich describes a singular "line of weakness" that includes a cut-out aperture, that patent is intrinsic evidence that a single tear line can be formed from different physical elements, including cut-out holes, that "together define one connected removal path." Dkt. 76, at 25.

To support its reliance on the Leftwich patent, Delkor cites a line of Federal Circuit cases holding that an incorporated patent's disclosure "is considered part of the shared specification for the purpose of claim construction just as if it were expressly set out therein." Dkt. 76, at 23 (citing *X2Y Attenuators, LLC v. Int'l Trade Comm'n*, 757 F.3d 1358 (Fed. Cir. 2014)). But "incorporation by reference does not convert the invention of the incorporated patent into the invention of the host patent." *Finjan LLC v. ESET, LLC*, 51 F.4th 1377, 1382 (Fed. Cir. 2022) (quoting *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1553 (Fed. Cir. 1996)). If a host patent describes a disputed term differently than a related patent does, or if its prosecution history suggests a different construction than the related patent, then a patentee cannot get around its own patent by pointing to related patents that are incorporated

by reference. *Id.*; *see also Fifth Generation Computer Corp. v. Int'l Bus. Machines Corp.*, 416 F. App'x 74 (Fed. Cir. 2011).

Here, even if the court assumes that "tear line" and "line of weakness" are synonyms, the Leftwich patent does not support Delkor's proposed construction of "single tear line." The court agrees with Delkor that the Leftwich patent discloses a single "line of weakness" with an aperture at its midpoint. (The Leftwich patent doesn't actually use the word "single," but it refers to *the* line of weakness, which suggests that there is only one.) But critically, the Leftwich patent never describes the line of weakness as "continuous," whereas the '580 and '919 patents do so repeatedly. '580 patent, at 4:50–53. That suggests an intention to exclude designs like Leftwich's, which has non-continuous perforations separated by a cut-out handhold.

In sum, the court concludes that the "single tear line" limitation requires a continuous physical tearing mechanism that extends through the case blank. Applying this construction, the accused product does not meet the "single tear line" limitation because it has a handhold separating two perforated tear lines. Delkor argues briefly that the accused product has a physically continuous tear line because a handhold is just a larger version of a perforation—both are holes in the packaging material. But that stretches the definition of "perforation" past its breaking point. No reasonable jury could find that a handhold and a perforation are the same thing.

Delkor's infringement argument based on the doctrine of equivalents also falls flat. Delkor relies on the testimony of its packaging design expert Gregory Batt, who opined that the tear lines in the patented product and the accused product function in the same way. Dkt. 70. Batt explained that in the patented design, the user converts the shipping configuration to the display configuration by opening the top section and then pulling on it

from one direction to the other in a single motion, tearing it away from the bottom section. Dkt. 70, at 17. The accused product's instructions suggest a different method of converting the box to the display configuration, which uses the handhold between the perforated tear lines. But Batt says that despite the instructions, the easiest way to convert the accused product to the display configuration is to tear it in a single motion, in the same manner as the patented product. *Id.* at 17–20.

Even if Batt is correct that an end user would decide to tear the two products using the same type of motion, that doesn't mean that they perform substantially the same function in substantially the same way. In fact, Batt acknowledges that the presence of the handhold on the accused product affects how the product tears: he explains that "the presence of the opening in the tear line makes separation of the top portion of the package assembly easier to accomplish," because the handhold portion is already pre-separated. *Id.* at 20. That's a critical admission, because according to Batt, easy conversion between the shipping and display configurations is one of the key innovations of the patented product. *Id.* at 6. No reasonable jury could find that the accused product is an equivalent of the patented product when Delkor's own expert admits that there is a difference in function related to a key feature of the patented product.

The court concludes that Pratt is entitled to summary judgment of noninfringement of the '919 and '580 patents because the accused product does not meet the "single tear line" limitation of those patents. That's enough to resolve the case, so the court need not consider the parties' other infringement arguments.

ORDER

IT IS ORDERED that:

1. Defendant Pratt Industries, Inc., Pratt Retail Specialties, LLC, and Pratt (Beloit Corrugating), LLC's motion for summary judgment of non-infringement, Dkt. 78, is GRANTED.

2. Plaintiff Delkor Systems, Inc.'s motion for partial summary judgment on infringement, Dkt. 74, is DENIED.

3. The clerk of court is directed to enter judgment for defendants and close this case.

Entered November 6, 2026.

BY THE COURT:

/s/

JAMES D. PETERSON
District Judge